# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VICTOR MOCANU | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ROBERT S. MUELLER, et al. | : | NO. 07-0445 |

---

| | | |
|---|---|---|
| GUISEPPE CUSUMANO | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| ALBERTO GONZALES, et al. | : | NO. 07-0971 |

---

| | | |
|---|---|---|
| MOHAMMAD BARIKBIN | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES, et al. | : | NO. 07-3223 |

---

| | | |
|---|---|---|
| TONGZIAO ZHANG | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL CHERTOFF, et al. | : | NO. 07-2718 |

---

| | | |
|---|---|---|
| ANDREW O. NEWTON, M.D. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| DONALD MONICA, et al. | : | NO. 07-2859 |

---

| | | |
|---|---|---|
| SAID HUSSAIN | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MICHAEL B. MUKASEY, et al. | : | NO. 08-195 |

<u>**MEMORANDUM RE: CROSS MOTIONS FOR SUMMARY JUDGMENT**</u>

**Baylson, J.**                                                                                      **February 8, 2008**

Plaintiffs in all these cases sue to require the United States Citizenship and Immigration

Services ("USCIS") to act on their pending applications for naturalization.  This is the situation

in many other cases pending before federal judges in this and other districts throughout the

United States.  Plaintiffs allege that they are lawful permanent residents ("LPRs"), whose

applications have been pending without any action, whether an approval or rejection, for lengthy

periods, ranging from 30 to 47 months.  They contend that this inaction has been caused by

unreasonable delays in the completion of the Federal Bureau of Investigation ("FBI") name check

program.

For the reasons set forth below, the Court concludes that USCIS' use of the FBI name

check program has never been authorized by statute or regulation, and its continued application

to Plaintiffs is improper because of the unreasonable delays it has caused in the adjudication of

Plaintiffs' applications for naturalization.  The Court will give USCIS an opportunity to promptly

initiate notice and comment procedures leading to revised regulations.

**I.       <u>Background Facts</u>**

The facts alleged in each of the Complaints, not disputed by the government, are as

follows:

**A.       <u>Victor Mocanu</u> (C.A. No. 07-445)**

Victor Mocanu, a citizen of Romania, alleges that he meets all of the requirements to

become a U.S. Citizen.  USCIS received Mr. Mocanu's Application for Naturalization on March

19, 2004.  Plaintiff was fingerprinted shortly thereafter and scheduled to interview with USCIS

on February 24, 2005.  In January 2005, USCIS notified Plaintiff that the February 24, 2005

interview had been canceled "due to unforeseen circumstances."  In August 2005, USCIS

informed Plaintiff that his case remained unresolved awaiting the results of the FBI background

check, which could delay the case for "an undetermined amount of time."  Since then, Plaintiff

has heard nothing from USCIS and, nearly two years later, his application remains pending.

Pet.'s Compl. at ¶ 15-18.

###    B.    Guiseppe Cusumano (C.A. No. 07-0971)

Guiseppe Cusumano was born in Italy on April 14, 1962, and has been a permanent

resident of the United States since June 9, 1965.  Mr. Cusumano applied to USCIS for citizenship

on February 22, 2005.  On March 14, 2006, USCIS granted Plaintiff an interview.  Plaintiff

passed the examinations for naturalization in English, U.S. History, and Government. On June 1,

2006, Plaintiff contacted USCIS to check on the status of his naturalization application and was

informed, by letter, that his application was still pending "due to security clearance."  To

Plaintiff's knowledge, USCIS has taken no further action on his application.  Pl.'s Pet. for

Mandamus and Injunction, at 1-2.

###    C.    Mohammed Barikbin (C.A. No. 07-3223)

Mohammed Barkibin, along with his wife, Ferideh Barikbin, filed an Application for

Naturalization on September 13, 2004.  Pet.'s Compl. at ¶ 12.  USCIS initially scheduled an

interview for Mohammed Barkbin for June 14, 2005, but in May the Agency informed him that

the interview had been "descheduled."  Id.  In order to find out more information, Mr. Barikbin's

attorney scheduled an Infopass appointment at USCIS in September, 2005.  Id. at ¶ 13.  He was

advised at the meeting that the Barikbins' security checks had not yet been completed but was

given no information about the nature of the security problems, the status of the cases, nor the anticipated length of the delay.  The Barikbins filed this action on August 7, 2007.  Since filing this lawsuit, Ferideh Barikbin's application for naturalization has been granted and therefore her case is moot.  Mohammed Barkbin's application has been pending for more than 40 months.

Plaintiffs fled from Iran in 1988 and sought asylum in the United States, based upon Plaintiffs' public opposition to the Islamic government in Iran.  They were approved for permanent residence in the United States on December 3, 1999.  Mr. Barikbin is the principal owner of five businesses that employ a total of 38 workers.  Id. at p.1.

D.      **Tongxioa Zhang** (C.A. No. 07-2718)

Tongxioa Zhang filed an Application for Naturalization on July 28, 2005.  Plaintiff claims that she made numerous inquiries to USCIS about the status of her application, and has been told that her application has been held up because of some difficulty with her FBI background check.  On June 29, 2007, Plaintiff initiated the action before this court.  USCIS scheduled an interview for Plaintiff twice, on January 10, 2006 and July 5, 2006, but both interviews were descheduled without explanation.  Pl.'s Opp'n. to Mem. of Law in Supp. of Def.'s Mot. to Dismiss 1-6.

E.      **Andrew O. Newton** (C.A. No. 07-2859)

Dr. Andrew Newton, a citizen of Nigeria, has been a lawful permanent resident of the United States since June 1, 1999.  Pet.'s Compl. at ¶ 2.  He resides in Harrisburg, PA, with his wife and children.  Dr. Newton filed an Application for Naturalization on or about March 18, 2004. Id. at ¶ 1.   On or about April 20, 2004, USCIS submitted a request for a background security name check to the FBI.  USCIS scheduled an interview for Dr. Newton on February 23,

2005, but subsequently descheduled the interview "due to unforeseen circumstances." Id.

USCIS has failed to reschedule the interview, or provide Plaintiff with any information regarding

why his application has been held up, other than to inform him that his background security

check has not been completed by the FBI.

      F.    **Said Hussain** (C.A. No. 08-195)

      Said Hussain filed his Application for Naturalization on March 4, 2005.  Pet.'s Compl. at

¶ 2.  He asserts that all legal prerequisites to determining his application have been satisfied.  Id.

at ¶ 20.  Mr. Hussain was interviewed by an examination officer on March 6, 2006.  Plaintiff sent

two letters to USCIS, the first dated September 6, 2006 and the second, labeled "2nd Request," on

October 18, 2006, inquiring about the status of his application and reminding USCIS that, by

law, they had 120 days from the date of Plaintiff's interview to process his application.  Id. at ¶ 6.

  On October 23, 2006, Plaintiff's counsel received a letter from USCIS District Director Donald

Monica stating that Plaintiff's final background check was pending "outside this office" and

would delay his case for an undetermined amount of time.  Id.  Plaintiff's attorney made another

inquiry to USCIS on July 17, 2007, but received no response.  Id.

      In the first two cases listed above, the Court had denied the government's Rule 12

Motions to Dismiss for lack of subject matter jurisdiction.  See Mocanu v. Mueller, 2007 WL

2916192 (E.D. Pa. Oct. 3, 2007) and Cusumano v. Gonzales, 2007 WL 4390401 (E.D. Pa. Dec.

13, 2007).  In the other cases, at the Court's direction, the parties have filed cross Motions for

Summary Judgment after general agreement that there are no factual issues presented that require

a trial.  See Memoranda and Orders dated December 21, 2007 (2007 WL 4570758), January 11,

2008 (2008 WL 154606) and January 25, 2008 (2008 WL 238443), (reviewing the statutory and

regulatory framework for adjudicating naturalization petitions and the limited judicial role in this process, but questioning the government's litigation strategy and its rationale for basing the delay in processing applications on national security grounds).

The Court has also held hearings on January 8, 2008 and January 22, 2008, the subject matter of which is reviewed in the prior Memoranda. As requested, the parties filed further briefs on February 1, 2008, specifically discussing whether the USCIS' practice of requiring an FBI "name check," as a prerequisite for acting on the Plaintiffs' naturalization petitions, was appropriately authorized, particularly in light of the delays caused these Plaintiffs by reason of the name check process.

## II.   **Contentions**

Several of the Plaintiffs have filed a joint brief in which they assert that the name check requirement is not authorized by law or regulation, and is not necessary, citing various authorities and primarily relying on <u>Aslam v. Mukasey</u>, 2008 WL 220708 (E.D. Va. Jan. 25, 2008).[1] In its

---

[1]It is important to note that Plaintiffs Cusumano and Hussain have already had their interviews with USCIS, even though their FBI background checks are pending. The government takes the position that the term "examination" in 8 USC § 1447(b) and 8 CFR § 335 refers to the USCIS and FBI's entire process; however, this Court follows other holdings that the term "examination" in 8 USC § 1447(b) and 8 CFR § 335 refers to the interview. <u>See</u> <u>Al Daraji v. Monica</u>, 2007 WL 2994608, at *3 (E.D. Pa., October 12, 2007). Pursuant to 8 CFR § 335.2(b), the USCIS examination should occur <u>after</u> USCIS receives the results of the name check from the FBI. ("Completion of criminal background checks before examination. The Service will notify applicants for naturalization to appear before a Service officer for initial examination on the naturalization application only after the Service has received a definitive response from the Federal Bureau of Investigation that a full criminal background check of an applicant has been completed.") It therefore appears that USCIS is not following its own regulations. The Court will rule that because more than 120 days have expired since these Plaintiffs' interviews, the Plaintiffs are entitled to relief forthwith. <u>See</u>  8 USC § 1447(b). <u>See</u> the subsequent opinion in <u>Al Daraji</u>, 2008 WL 183643 (E.D. Pa., Jan. 18, 2008).

brief, the government makes several arguments[2] to support the appropriateness of a "name check."  First, the government asserts that Congress has required USCIS to obtain the results of a "full criminal background check" before any application for naturalization may be adjudicated; this Congressional directive led to the Immigration and Naturalization Service ("INS")[3] adopting a regulation which requires that a "FBI check of both criminal and administrative records be completed before any review of the applicant has been scheduled." 8 C.F.R. § 335.2(b), 63 Fed. Reg. 12987 (1998).

The government also asserts that a name check is properly included in the "full criminal background check" and is also part of the inquiry into whether the applicant possesses good moral character, citing I.N.A. § 316(a)(3), 8 U.S.C. § 1427(a)(3).  Furthermore, according to the government, "such checks also assist in identifying individuals barred from naturalization under 8 U.S.C. § 1424 – information that would not necessarily be provided in only a criminal history

---

[2]The government's latest brief attaches the Second Declaration of Donald Neufeld, supplementing his testimony at the hearing on January 22, 2008, and giving further details concerning the applications for three of the Plaintiffs, Hussain, Zhang and Barikbin, whose case status could not be established in an online inquiry as part of the hearing on January 22, 2008. Mr. Neufeld asserts that even though the information was not readily available for these three individuals online, a further check through the USCIS toll free telephone line would have provided information. Although there may be some factual issues concerning this, the Court does not deem it particularly relevant for present purposes.

The other Declaration submitted by the government is from Gregory B. Smith, Acting Associate Director, National Security and Records Verification, for USCIS. Mr. Smith gives further details about USCIS' policy for securing name checks, some of which will be discussed below. The Court had expected that Declarations, such as that of Mr. Smith, would have been submitted along with the government's cross Motions for Summary Judgment, which were previously filed, so that Mr. Smith would have appeared at the hearing on January 22, 2008, for purposes of cross examination, as was done with Mr. Neufeld. Despite this procedural irregularity, however, the Court will consider Mr. Smith's Declaration as not stating any facts which the Plaintiffs would dispute.

[3] INS is the predecessor agency to USCIS.

check."

The government's second argument is that the courts should defer to USCIS' definition of what constitutes a "full criminal background check."  The government relies on Chevron USA v. NRDC, 467 U.S. 837 (1984) and Vermont Yankee Nuclear Power v. NRDC, 435 U.S. 519 (1978) for this proposition.

The government's brief cites cases which purportedly "have continuously found that USCIS may construe the FBI name check as either synonymous with the FBI criminal background check or as part of it, and so properly may await name check results before adjudicating applications."  Defs.'s Brief Pursuant to the Court's Order of January 2, 2008, , 07-cv-445, Doc. No. 26 at 6.  Each of these cases will be discussed below.

The government's last argument is that the requirement of an FBI name check for naturalization applicants is reasonable.  The Court doubts that it is appropriate to determine this issue as it is presented by the government, because this is not a question for a judge to decide. Rather, the issues presented are whether, under the Administrative Procedure Act ("APA"), (1) since Congress never authorized USCIS to require a "name check," may USCIS require a name check for each of these Plaintiffs, and continue to delay action on their naturalization applications merely because the name check has not been concluded; and (2) is the delay in acting on Plaintiffs' applications reasonable.

## III.   FBI's Name Check Program

When USCIS receives an application for naturalization, it opens a file and automatically requests a name check on the applicant from the FBI.  See "Declaration of Evangelia A. Klapakis," Civ. No. 07-3223, Doc. No. 7, Ex. A (hereinafter "Klapakis Declaration") ¶ 7.

USCIS then takes several steps to ensure that the FBI received its request for a name check. Klapakis Declaration, ¶¶ 8-9.

The FBI performs its name checks upon request from USCIS, and upon requests from many other agencies as well.  See "Declaration of Michael A. Cannon," Civ. No. 07-3223, Doc. No. 7, Exh. B (hereinafter "Cannon Declaration") ¶ 4.[4]  There are four stages involved in an FBI name check:  batch processing, name searching, file review, and dissemination.  Cannon Declaration, ¶ 13.  For naturalization applicants, batch processing consists of USCIS transferring to the FBI a magnetic tape which contains up to 10,000 names, and FBI checking these names against its Universal Index.  Id.  At this first stage, approximately 68% of the names produce a "No Record" result, and the FBI informs USCIS of these results.  Id.  It is implied, although not completely clear, that an applicant's name check process is complete when a "No Record" result is produced.[5]

Names that do not produce a "No Record" result at the first stage proceed to the second stage, name searching.  Cannon Declaration, ¶ 14.  At the name searching stage, an FBI employee enters the applicant's name into a computer database and searches "different fields and information."  Id.  This name searching produces additional "No Record" results; and after the first and second stages of FBI's name check process, 90% of the name check requests receive

_____

[4] This description of the FBI name check program focuses on the program as it pertains to requests for name checks from USCIS.

[5] One reason it is not clear whether a "No Record" result definitively concludes the name check process is that the FBI states "[a]dditional searches against the FBI's Universal Index, additional manual name searches, and/or additional file review of a name check request, depending on the length of time a name check request is pending in the processing queue, may occur periodically during the name check process to ensure that stale information is updated." (See Cannon Declaration, ¶ 16).

"No Record" results.  Id.

The remaining 10% of applicants are viewed as "possibly being the subject of an FBI record," and their name check requests continue to the third and fourth stages of FBI's process, namely file review and dissemination.  Cannon Declaration, ¶ 15.  The file review can be either electronic or manual, depending on whether the files to be reviewed have been uploaded into the FBI's electronic record-keeping system.  Id.  The FBI reviews files for possible derogatory information and, "if appropriate" disseminates that information to USCIS.  Cannon Declaration, ¶ 17.  The FBI states that less than 1% of USCIS' name check requests are identified with files that contain possible derogatory information.

In general, FBI performs name checks on a first-come, first-served basis.  Cannon Declaration, ¶ 18.  However, USCIS may request that certain name checks be expedited.  See Cannon Declaration, ¶ 18; USCIS Update, "USCIS Clarifies Criteria to Expedite Name Check," February 20, 2007, available at http://www.uscis.gov/files/pressrelease/ExpediteNameChk022007.pdf, hereinafter "USCIS Update").  Prior to February 20, 2007, USCIS requested that the FBI expedite a name check request when a federal court petition had been filed in the relevant case.  See USCIS Update.

According to USCIS, it may request expedited review if an applicant's case meets one of the other "approved criteria" including 1) Military deployment; 2) Age-out cases not covered under the *Child Status Protection Act*, and applications affected by sunset provisions such as diversity visas; 3) Significant and compelling reasons, such as critical medical conditions; and 4) Loss of social security benefits or other subsistence at the discretion of the USCIS District

Director.  Id.[6]  USCIS may request expedited treatment for up to one hundred names per week.

See transcript of hearing, January 22, 2008, p. 57, where Donald Neufeld responded to questions

about the expediting process.  USCIS generally meets this quota.  Id.

     As noted above, the government has also submitted a Declaration from Gregory B. Smith,

the Acting Associate Director of the National Security and Records Verification Directorate of

USCIS, with its most recent brief.  See "Declaration of Gregory B. Smith," Civ. No. 07-445,

Doc. No. 26, Ex. A (hereinafter "Smith Declaration").[7]  Despite this Court's specific request for

information and briefing on USCIS's practice of requiring an FBI "name check," the Smith

Declaration does not address when or why USCIS determined that FBI "name checks" were

necessary for all applicants.  The Smith Declaration does state, somewhat opaquely, that as a

result of the tragic events of September 11, 2001, the agency became aware of a need to conduct

more rigorous and thorough security checks, and that "[t]his recognition resulted in the

implementation of procedures that result in the delay – and in some cases denial – of immigration

benefits to certain individuals."  Smith Declaration, ¶ 6.  It is unclear to the Court whether the

"procedures that result in the delay" are the "name check" procedures or other procedures.

     The FBI Name Check is one of several different background checks that USCIS either

performs itself or requests the FBI to perform in order to determine whether an individual is a

risk to national security or public safety.  Smith Declaration, ¶ 5.  In addition to a name check,

the FBI also conducts a fingerprint check for relevant criminal history records.  Id.  USCIS itself

---

    [6] It is not clear what the other "approved criteria" are, nor what reasons constitute
"significant and compelling" reasons.

    [7] The Smith Declaration refers to "background checks" as well as "security checks," and
it is unclear whether they indicate the same thing.

conducts both a check of the records in the Department of Homeland Security immigration

systems and a check against the U.S. Customs and Border Protection's Treasury Enforcement

Communications System (previously known as IBIS).  Id.  USCIS may also inquire into an

applicant's foreign travel, income tax obligations, international financial transactions,

memberships and associations, and military training and service.  Smith Declaration, ¶ 15.   None

of these procedures appear to be authorized by legislation or regulation.

IV.   **Discussion**

    A.   **Legitimacy of USCIS Regulation Regarding Name Checks**

As a result of the factual materials that are presented in the record, and the briefs of the

parties, there is no dispute that the cause of the delay in the disposition of Plaintiffs'

naturalization applications is the delay in the conclusion of the FBI name check, which USCIS

has requested as part of its investigation into each of the Plaintiffs' background.  It is therefore

necessary, in deciding the reasonableness of the delay in action on Plaintiffs' naturalization

applications, to look first into the origin and legitimacy of the name check requirement.

The only instance of Congressional action relevant here is a 1998 appropriations bill

using the term "full criminal background check," barring INS from completing adjudication of an

application for naturalization unless it has "received confirmation from the Federal Bureau of

Investigation that a full criminal background check has been completed, except for those

exempted by regulation as of January 1, 1997."  See footnote 3, page 6 of the Mem. of January

11, 2008.

Initially, such a provision in a non-codified appropriations bill may be a confirmatory

approval of existing practices of requiring a full criminal background check, but it is doubtful

authority to cite as a mandate for agency action, or authority for the agency to use that phrase as a Congressional mandate for agency procedures impacting millions of lawful permanent residents who have applied for naturalization.  However, the analysis which follows does not require an answer to this issue.

INS did go through the notice and comment procedure in adopting 8 C.F.R. § 335.2, on which the government relies.  Because of the government's extensive reliance on 8 C.F.R. § 335.2, it is necessary to cite the Regulation in full:

> (b) Completion of criminal background checks before examination.
> The service will notify applicants for naturalization to appear
> before a Service officer for initial examination on the
> naturalization application only after the Service has received a
> definitive response from the Federal Bureau of Investigation that a
> full criminal background check of an applicant has been
> completed.  A definitive response that a full criminal background
> check on an applicant has been completed includes:
>
> (1) Confirmation from the Federal Bureau of Investigation that an
> applicant does not have an <u>administrative</u> or a criminal record;
>
> (2) Confirmation from the Federal Bureau of Investigation that an
> applicant has an <u>administrative</u> or a criminal record; or
>
> (3) Confirmation from the Federal Bureau of Investigation that two
> properly prepared fingerprint cards (Form FD-258) have been
> determined unclassifiable for the purpose of conducting a criminal
> background check and have been rejected.

(Emphasis added).

In the supplementary information of 63 Fed. Reg. 12987, the INS explained some of its policies under the title, "What Changes is the Service Making to its Regulations?"  Change Number 13, entitled "Changes in § 335.2," states that before the change in policy, the FBI performed criminal background checks on applicants for naturalization and notified the INS of

the results of these checks before INS would examine the applicants.  The INS changed its policy, stating that it now required a "definitive response" from the FBI, and not simply results, on an applicant's criminal background check before scheduling an examination.  In defining "definitive response," the INS adds "name check" requirements that never before existed in the naturalization process.  A "definitive response" from the FBI, according to the INS, would be that an applicant does or does not have "an administrative or criminal record."

In order to analyze the government's argument, it is necessary to understand that USCIS contends the language in § 335.2(b)(1)(2), whether an applicant does or does not have "an administrative or a criminal record," is justified by the Congressional language, a "full criminal background check," as authorizing an inquiry of the FBI as to whether an applicant also has an "administrative" record – without any further indication of what the term "administrative" record means in this context.  The government's brief then asserts that the vague term "administrative" ipso facto authorizes the FBI name check procedure.  It is crucial to note that the regulation itself does not refer to an FBI name check.  These leaps of argument are not supported by any statutory language, principles of statutory construction, principles of administrative law or logic.

There is no showing that the term "administrative" record is synonymous with or inclusive of an FBI name check.  Indeed, there is no showing whatsoever as to what an "administrative" record is, as maintained by the FBI.  Both the Cannon Declaration and the Supplemental Cannon Declaration refer to "administrative cases" in their descriptions of FBI's Central Records System, see e.g. Cannon Declaration ¶ 9, but not to "administrative" records.  There is no basis to determine how an "administrative case" differs from an "investigative case" and whether that distinction relates to the difference between an administrative and criminal

record, or how either relate to a "name check."  These different terms create a baffling maze.

The FBI name check process has been in existence since the Eisenhower administration.

See Cannon Declaration, ¶ 4 and the FBI website, www.fbi.gov/nationalnamecheck.  There is no

explanation as to what Congress intended, when it enacted the Appropriations Bill and used the

term "full criminal background check."  However, if in fact Congress intended for USCIS to

require a "name check," Congress presumably would have used this term because the "name

check" program had been in place for many years, and Congress could have directly referenced a

"name check," but did not do so.

Similarly, in 1998, as discussed below, when INS first published the current regulations

which described required background checks, it did not use the term "name check" even though

it, as a sister agency of the FBI, then both within the Department of Justice, would have known

of the existence of the "name check" program.  The record does indicate that, in November 2002,

heightened national security concerns prompted a review of USCIS background investigation

procedures.  See Cannon Declaration, ¶ 23.  The review determined that more thorough

background investigations were necessary, and that one way to conduct more detailed

investigations was use of the FBI "name check" program.  Id.  It is not completely clear whether

"name checks" became necessary for all USCIS applicants starting in November 2002, but that

may be one interpretation of the Cannon Declaration.

To summarize, the record does not provide any support for the government's assertion,

that by using the language "full criminal background check," Congress intended for the broader

"name check" investigation, as USCIS suggests in its brief.  There is simply no legislation which

mandates or authorizes USCIS to employ an FBI name check as a prerequisite for a lawful

permanent resident to become a naturalized citizen.  Further, the regulations which USCIS has enacted itself do not use the term "name check" at all.  The closest term that is used in the regulations refers to an "administrative" record of the FBI, without any further definition.  There is no basis in the record from which the Court can conclude that the regulatory reference to an FBI "administrative" record is synonymous with an FBI name check.  Thus, there is no support that the current USCIS practice of securing an FBI name check as a prerequisite to an LPR becoming a naturalized citizen is authorized by statute or regulation.

Assuming arguendo, the language in the Appropriations Bill at issue, Public Law 105-119, authorized INS to adopt regulations that would define the term "full criminal background check," the record does not show how this Congressional language was transposed into the language actually appearing in the Regulation, § 335.2(b).  The record does not show what was meant by the use of the word "administrative" or how that relates to a criminal record.  Nor does the record show why the agency did not use the normal meaning of the "criminal background check," which would mean, in common parlance, whether the person had been arrested or convicted, i.e. a "rap sheet," which is essentially what Mr. Neufeld described in his testimony as encompassed within the term "fingerprint check."  The record does not show what is the difference between a "administrative" record and a "criminal record."

**B.    Role of the FBI**

The prior Memoranda revealed that the FBI uses its name check program for a wide variety of investigative purposes, including its own criminal and background investigations, and provides this service to many other governmental agencies, federal, state and local.  Thus, USCIS is simply one of many "customers" who avail themselves of the FBI name check program.  There

is no reason in this litigation to question the validity or integrity of the FBI name check program. Indeed, the Court does not question that some name checks may take a long time for legitimate reasons. The only inquiry here is the validity of USCIS delaying naturalization applications of Plaintiffs because the FBI name check is taking a long time, which must be seen in the context of the above discussion of USCIS regulations, and the fact, as it appears from the record, all applicants for naturalization have already gone through a prior FBI name check.

The FBI will expedite 100 name checks per week at the request of USCIS.[8] <u>See</u> transcript of hearing, January 22, 2008, p. 57. The record does not show how long the completion of the name check takes if USCIS requests that it be expedited.

Because the record shows that the institution of the name check is exclusively under USCIS, and that the FBI merely acts as requested and/or directed by USCIS, it is clear that the FBI should not be a defendant in these cases, and the Court's Order following this Memorandum will provide for dismissal of the FBI and its officials who have been named as defendants in these cases.

**C.**    <u>**Judicial Decisions on this Issue**</u>

The government cites to a line of cases in support of its argument that "full criminal

---

[8] To put this figure of 100 name checks per week in context, "[a]s of May 2007, USCIS reported a staggering 329,160 FBI name check cases pending, with approximately 64 percent (211,341) of those cases pending more than 90 days and approximately 32 percent (106,738) pending more than one year." CIS Ombudsman Annual Report 2007, p. 37, <u>available</u> at http://www.dhs.gov/xlibrary/assets/CISOMB_Annual%20Report_2007.pdf. It is therefore easy to see that expediting a particular name check will do little to reduce the number of long pending name checks. The Ombudsman Report also shows that there are more than 50,000 name checks pending for more than two years, and more than 31,000 pending more than 33 months, as of June 2007.

background check" can or does mean "name check."  As an initial matter, the Court has a full

summary judgment record before it, but the opinions cited by the government were not based on

fully developed records.  See Wang v. Gonzales, 2008 WL 45492 (D. Kan., January 2, 2008)

(Motion to Dismiss or Remand to USCIS); Morral v. Gonzales, 2007 WL 4233069 (D. Minn.,

Nov. 28, 2007) (Motion to Dismiss or Remand to USCIS); Stepchuk v. Gonzales, 2007 WL

185013 (W.D. Wash., Jan. 18, 2007) (Motion for Reconsideration of Remand to USCIS); Aman

v. Gonzales, 2007 WL 2694820 (D. Colo., Sept. 10, 2007) (Motion to Dismiss, Stay, or Remand

to USCIS); Shalabi v. Gonzales, 2006 WL 3032413 (E.D. Mo., Oct. 23, 2006) (Motion to

Dismiss or Remand to USCIS).[9]

Indeed, none of the cases cited by the government refer to documents such as the Cannon

Declaration, which constitutes a significant part of the record in this case.  In ruling on the cross-

motions for summary judgment, this Court must evaluate the record before it and does not find

the cases cited by the government instructive.

Of the cases cited by the government, Morral, 2007 WL 4233069, does not analyze

whether a "full criminal background check" includes a "name check" but simply provides a

conclusory description of 8 CFR § 335.  Morral, 2007 WL 4233069 at *1 ("8 CFR § 335 sets

forth a multiple step background-check process for naturalization applicants, of which the FBI

name check is but one step.")  Morral does not address how, given that the regulation does not

refer to a "name check", a "name check" became a required step.

Of the other cases cited by the government, three analyze the text of 8 CFR § 335.2(b)

---

[9] Many of these motions to dismiss were for lack of subject matter jurisdiction, pursuant
to Fed. R. Civ. P. 12(b)(1).

and conclude that USCIS has the authority to require a name check because of the regulation's use of the term "includes."  See Aman, 2007 WL 2694820 at *3; Stepchuk, 2007 WL 185013 at *2; Shalabi, 2006 WL 3032413 at *2.  The government also advances this "includes" argument in its brief.  (See Defs.' Br., Civ. No. 07-445, Doc. No. 26, pp. 6-7.)  The argument focuses on the language cited at p. 12-13 above.

According to the argument, because the regulation uses the term "includes," the list that follows is not exhaustive, and thus, USCIS has the authority to require a "name check" even though the term is not on the list.  The problem with this argument is that while the list that follows the term "includes" is not necessarily exhaustive, the list does not set forth the components of a "full criminal background check" but only provides for several kinds of confirmations from the FBI.  The first two refer to an administrative or criminal record, and the third refers to "unclassifiable" fingerprint cards, all without further definition or explanation.  The "includes" argument would make more sense if, for example, the list following the term "includes" set forth various forms of background checks, such as an IBIS check, to which the "name check" could logically be added.  The Court finds the "includes" argument unpersuasive.

The remaining case cited by the government, Wang, 2008 WL 45492, provides a string citation to Aman, Stepchuk, and Shalabi.  In relying on these three cases, Wang adopts the "includes" argument, even though Wang itself does not explicitly analyze the use of the term "includes."

D.  **Applying Administrative Law Principles to the Facts of Record**

The Court concludes that USCIS has required FBI name checks under the mistaken

impression that it has authority, based on its own regulations, to require such checks for LPRs

who seek to become naturalized citizens.  Based on a review of the facts and bedrock principles

of administrative agency law, the Court finds that USCIS's name check requirement has (1)

never been authorized by Congress; (2) is not mentioned or contemplated by any fair reading of

the current USCIS regulations; and (3) may not, without USCIS initiating notice and comment

procedures, be used to delay action on Plaintiffs petitions for naturalization, particularly because

Plaintiffs have already undergone a name check in order to achieve LPR status and will clear the

"fingerprint check" described in the Memorandum of January 25, 2008.[10]  The fingerprint check

will show whether an LPR who is applying for naturalization has had any contact with the

criminal justice system that would warrant denial of the petition.

There is no desire or intent in the resolution of these cases to interfere with national

security screening, investigation, or protection of our homeland.  These are exclusively functions

_____

[10]On February 4, 2008, USCIS circulated an Interoffice Memorandum issuing revised guidance on the background check procedures for Applications for Adjustment of Status (I-485), Applications for Waiver of Ground of Inadmissibility (I-601), Applications for Status as a Temporary Resident Under Section 245A of the Immigration and Nationality Act (I-687), and Applications to Adjust Status from Temporary to Permanent Resident Under Section 245A of Public Law 99-603 (I-698) (collectively "Adjustment of Status Applications").  Under the revised guidance, before USCIS can approve Adjustment of Status Applications, it must obtain a definitive FBI fingerprint check and IBIS check.  USCIS will still request FBI name checks for Adjustment of Status Applications; however, if the FBI name check is pending for more than 180 days and an Adjustment of Status Application is otherwise approvable, USCIS will approve the Adjustment of Status Application without the results of the name check.  If the FBI name check later unveils derogatory or adverse information about an applicant (after the applicant's Adjustment of Status Application has been approved), USCIS will determine if rescission or removal proceedings are appropriate and warranted.

The revised guidance does not affect Applications for Naturalization (N-400) and thus does not affect the issues in the cases currently before the Court.

The government has filed the Interoffice Memorandum as well as an explanatory email as a supplement to the Administrative Record.  (See Civ. No. 07-445, Doc. No. 27).

of the executive branch of government in which courts should not interfere.  At the same time,

the Court has an obligation to rule on a contention that an administrative agency has not followed

the dictates of the APA.  The Court strictly limits its decision in these cases to carrying out the

jurisdiction provided under the APA.

This Court finds it problematic that the policy USCIS has adopted - to require not only a

criminal background check, but a name check as well - was never subject to the notice and

comment procedures of rule-making resulting in new regulations.  The government correctly

points out that the APA does not require administrative agencies to follow notice and comment

procedures in all situations.  In promulgating substantive rules, federal administrative agencies

are required by the APA to provide notice of the proposed rule and accept and consider

comments from interested persons.  5 U.S.C. § 553.  "Interpretive" rules are exempt from this

requirement under 5 U.S.C. § 553(b)(3)(A).  The Act does not provide a definition of

"interpretative."

### 1.     Case Law on Requiring Notice and Comment

The leading Third Circuit case is Dia Nav. Co., Ltd. v. Pomeroy, 34 F.3d 1255 (3d Cir.

1994), which outlined the distinction between a legislative rule from an interpretive rule.[11]  As

stated in a more recent case, and one relied on by the government, "[L]egislative rules are subject

to the notice and comment requirements of the APA because they 'work substantive changes in

prior regulations,' or 'create new law, rights, or duties.'"  SBC Inc. v. Federal Communications

Com'n, 414 F.3d 486, 497 (3d Cir. 2005) (internal citations omitted).  In contrast, "[i]nterpretive

---

[11] See also this Court's initial discussion of this topic in footnote 7 of the Memorandum
dated January 25, 2008 (2008 WL 238443).

rules constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.  Interpretive rules are not intended to alter legal rights, but to state the agency's view of what existing law requires."  <u>Appalachian States Low-Level Radioactive Waste Com'n v. O'Leary</u>, 93 F.3d 103, 112 (3d Cir. 1996).

In <u>Dia</u>, the Court examined the INS policy of placing upon common carriers the burden of detaining stowaways who have applied for asylum in the United States.  The district court had dismissed the carrier's complaint and denied the carrier's motion for summary judgment insofar as it sought a judgment declaring that the INS policy on detention of stowaways was invalid for failure to comply with the notice and comment procedures of the APA.  The Court of Appeals found both holdings improper, concluding that the INS rules in question were legislative in nature.  The Court pointed to the fact that the statute did not set out a standard concerning liability for the costs of detention or the conditions of detention.  The Court likened the INS's adoption of rules in the face "of what is at best statutory ambiguity" to being "no less a legislative decision than would be the adoption of a detailed code concerning the limits and conditions of detention."  <u>Dia</u>, 34 F.3d at 1265.  The Court concluded: "[T]he INS has stretched the limits of the [Immigration and Naturalization Act], without the benefit of input from the affected parties, and now contends that these parties are without power to challenge its actions. This plainly amounts to legislative rulemaking."  <u>Id.</u>

The Court in <u>Dia</u> also considered the impact of the INS's rule.  Due to the rule, the carrier had been forced to take on considerable burdens, both economic and practical, in detaining stowaways.  The Court concluded that INS was required to have a notice and comment period pursuant to the APA with respect to the detention, and because the extent and conditions

of carriers' obligations were unclear, the INS also had to promulgate rules governing these issues and addressing questions concerning the extent and conditions of detention, pursuant to a notice and comment period as well. Id. at 1266. The Court remanded the case to the district court to award a declaratory judgment in favor of the carrier on its claim concerning the INS policy.

In the present case, the government cites SBC, supra, and Gatter v. Veteran's Administration, 672 F.2d 343 (3d Cir. 1982) in arguing that USCIS's decision to require an administrative name check was an interpretation of, and not a substantive change to, 8 C.F.R. § 335.2.[12] In Gatter, the Third Circuit found that internal publications of the Veterans' Administration ("VA") were interpretive, reasoning in part that the publications "have never been intended for or used by anyone other than VA employees." Id. at 347. But the agency's action in Gatter differs from that in the present case. In Gatter, the VA's policies were setting standards for internal use only and were clearly interpretive, which is not the case here. In SBC, the Court of Appeals concluded that the order under review did not modify or substantively change the FCC's prior interpretation of a regulation, nor did it impose new duties upon regulated parties, and therefore the notice and comment requirements of the APA did not apply. SBC, 414 F.3d at 501. In contrast, in requiring yet another name check in the naturalization process, USCIS has moved beyond an interpretive rule and its policies have severe impact on thousands of LPRs and their families.

## 2.     Impact of USCIS Rules on Plaintiffs

---

[12]The government also cites Antonishin v. Keisler, 2007 WL 2788841 (N.D. Ill., Sept. 20, 2007), to support its name check argument, but that case was also limited to deciding a motion to dismiss without a full factual record.

The Court can only conclude that the USCIS policy to require name checks for all LPRs who want to become naturalized citizens, while undoubtedly well-intended, was a substantive change, which is having a "substantive adverse impact on [the Plaintiffs]"  Chao, supra, at 227; see also SBC, supra, at 497.  Just as in Dia, USCIS has "stretched the limits" of its authority, "without the benefit of input from the affected parties, and now contends that these parties are without power to challenge its actions." Dia, supra, at 1265.  The Court of Appeals found this was improper, and Dia serves as precedent for this Court's ruling.

The Court is also influenced by the impact that these name checks have on the applicants. In Dia, the Court of Appeals found the carrier's considerable burdens, both economic and practical, to play a factor.  Those burdens pale in comparison to the burdens inflicted on these Plaintiffs by USCIS's name check policy.  As the Court has stated in previous Memoranda, these Plaintiffs have experienced delays of many months to several years, incurred substantial expenses, and lived with the resulting uncertainty in their personal and professional lives, and immeasurable impact on their families.   Furthermore, by delaying actions as to these applicants, law-abiding, tax-paying LPRs are denied the right to vote, which requires citizen status.  These delays result in a significant expenditure of public funds.   If the USCIS delays the applications of those who potentially pose a threat to homeland security, thus allowing them to remain in this country for an extended period of time, there is an increased risk to national security.

### 3.    USCIS Regulations "As Applied" to Plaintiffs

Assuming arguendo the agency's regulation may be facially valid, settled principles of administrative law also require an inquiry as to whether the regulation is valid "as applied" to these Plaintiffs.  Indeed, a flawed notice-and-comment process can render a regulation invalid as

applied to certain classes of people.  In <u>American Iron and Steel Institute v. EPA</u>, 568 F.2d 284

(3d Cir. 1977), steel companies challenged the validity of EPA regulations, arguing that the

notice of "proposed rulemaking" (ANPR) had been insufficient indication that the Agency was

considering regulations as to the specialty steel segment of the industry.  The Third Circuit

agreed with the steel companies, finding that the ANPR gave "no indication" that the Agency

intended to make any regulations on steel-making.  <u>Id</u>. at 291.  The Court concluded that while

the regulations may have been valid as applied to others, the regulations were invalid "insofar as

they appl[ied] to the special steel industry" due to the deficiency of the notice and comment

period.  <u>Id</u>. at 292.  <u>See also</u> <u>Harbert v. Healthcare Services Group, Inc.</u>, 391 F.3d 1140, 1153-54

(10th Cir. 2004) (holding that a Department of Labor regulation, while valid as applied to some

employees, was invalid as applied to an employee with a fixed work site yet subject to joint

employers).

Applying these precedents, the Court concludes that even if the USCIS regulations are

facially valid, they present unacceptable situations to Plaintiffs, who have been waiting between

30 and 47 months for action on their naturalization applications, without any explanation other

than "name check pending."

### E.   <u>Whether the Delay as to these Plaintiffs Is Reasonable</u>

As noted in previous Memoranda, the Court has jurisdiction over this matter pursuant to

the APA.  <u>See</u> 5 U.S.C. § 702 ("Right of Review"); 5 U.S.C. § 706 ("Scope of Review").

Pursuant to the APA, "[t]o the extent necessary to decision and when presented, the reviewing

court shall decide all relevant questions of law, interpret constitutional and statutory provisions,

and determine the meaning or applicability of the terms of agency action."  5 U.S.C. § 706.

Furthermore, the APA "directs an agency 'to conclude [within a reasonable time] a matter presented to it.'"  Int'l Union v. Chao, 361 F.3d 249, 253 (3d Cir. 2004) (quoting 5 U.S.C. § 555(b)), and "[t]he reviewing court shall compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

In Thompson v. U.S. Dept. of Labor, 813 F.2d 48 (3d Cir. 1987), the appellant, Thompson, filed a discrimination complaint with a federal agency.  The agency put appellant's claim on hold, and did not immediately reactivate his claim when the possibility arose to do so. Thompson alleged the Department had unreasonably delayed resolution of his case, and requested a judgment compelling the agency to conclude proceedings on his case within a reasonable time.  The Third Circuit reversed the summary judgment order of the district court, finding that Thompson had indeed asserted a claim under the APA based on the Department's failure to conclude the proceedings on his complaint within a reasonable time.  The fact that the agency action was not "final" did not alter the Court's analysis: "The APA 'give[s] courts authority to review ongoing agency proceedings to ensure that they resolve the questions in issue within a reasonable time.'"  Id. at 52, quoting Public Citizen Health Research Group v. Comm'r, Food and Drug Administration, 740 F.2d 21, 32 (D.C. Cir. 1984).  See also Heckman v. Olive, 1992 WL 390249, *8 (E.D.N.Y. Dec. 9, 1992).

Thompson held:

> The APA directs agencies to conclude matters presented to them "[w]ith due regard for the convenience and necessity of the parties . . . and within a reasonable time."  5 U.S.C. § 555(b) (1982).  It further provides that a "person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant section, is entitled to judicial review thereof."  5 U.S.C. § 702 (1982 and Supp. III 1985).

> Finally, the APA authorizes actions for a mandatory injunction to enforce compliance with its requirements, 5 U.S.C. § 703 (1982), and requires reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1) (1982).

> In light of the foregoing provisions of the APA, we believe that it authorizes actions in the district court to compel agency action unlawfully withheld or unreasonably delayed. . . .

Thompson v. U.S. Dept. Labor 813 F.2d 48, 52 (3d Cir. 1987).

In Aslam v. Mukasey, 2008 WL 220708 (E.D. Va. Jan. 25, 2008), although distinguishable in part because the plaintiff was seeking a change in status and not naturalization, Judge Brinkema's discussion of the delays caused by the name check program was decided on a summary judgment record which included factual materials, including a declaration by FBI Section Chief Cannon, who also supplied a declaration and supplemental declaration in these cases.  Recognizing the primary role that Congress plays in these decisions, Judge Brinkema nonetheless concluded that she should rule for the plaintiff because under APA principles, USCIS had unreasonably delayed action on the plaintiff's petition for change in status, and that USCIS bore responsibility for the FBI name check program:

> CIS maintains that completion of the FBI name check is indispensable to a full and fair adjudication of the application. However, CIS has discretion to select its investigatory methods and it retains the ability to control their pace.  See Cannon Decl. ¶ 18 (noting that "USCIS [may] direct[ ] that a name check be handled on an 'expedited basis'").  Because of the unreasonable delay in the processing of Aslam's name check and the government's inability or unwillingness to proffer specific reasons for the delay, the Court finds that CIS must expedite review of this application.

> Accordingly, the Court will grant plaintiff relief to the extent that it will order CIS to direct the FBI to expedite its processing of

Aslam's name check.  If the FBI is unable to complete the name
check within 90 days, CIS shall direct the FBI to identify in detail
the specific issues that are preventing the completion of the name
check.  CIS shall then report those reasons to the Court.  If the FBI
completes the name check within that time period, CIS shall
complete its adjudication of Aslam's application within 60 days of
receiving the FBI's report and file a certification informing the
Court of the disposition.

Aslam, 2008 WL 220708 *9.[13]

Judge Brinkema concludes that under the Administrative Procedure Act, specifically 5

U.S.C. § 706(1):

A reviewing court has the authority to "compel agency action
unlawfully withheld or unreasonably delayed."  Aslam may invoke
the remedy of mandamus "by proving the co-existence of three
elements: (1) the petitioner has shown a clear right to the relief
sought; (2) the respondent has a clear duty to do the particular act
requested by the petitioner; and (3) no other adequate remedy is
available."  *Estate of Michael ex rel. Michael v. Lullo*, 173 F.3d
503, 512-13 (4th Cir. 1999).

As the government notes, a suit to compel agency action under the
APA is conceptually similar to a petition for mandamus based on
agency delay.  *See Nat'l Ass'n of Home Builders v. U.S. Army Corp
of Engineers*, 417 F.3d 1272, 1280 (D.C. Cir. 2005).  To evaluate
the merits of Aslam's complaint, the Court must first determine
whether the two agencies–CIS and the FBI–owe a legal duty to
Aslam to act on his application and the associated name check.  *Id.*
If so, the Court must then determine whether those agencies have
"unreasonably delayed" in discharging that duty.  *Id.*

---

[13]Judge Brinkema reviewed the considerations under the leading case of
Telecommunications Research & Action Ctr. v. FCC ("TRAC"), 750 F.2d 70 (D.C.Cir. 1984),
which requires examination of a number of factors to determine the unreasonableness of a
particular delay.  The Third Circuit follows a different test, see discussion below.

Aslam, 2008 WL 220708 *4.

In one of its Motions for Summary Judgment, the government alleges that Plaintiff Barikbin has not met the six-factor TRAC test set forth for cases of alleged "undue delay."[14] (Def.'s Mot. for Summary Judgment, 07-cv-3223, Doc. No. 7).  Yet Plaintiff Barikbin, along with all other Plaintiffs presently before this Court, do not have the burden of satisfying the TRAC test.  The Court of Appeals for the Third Circuit has adopted reasoning similar, although not identical, to that of the TRAC decision.  In Oil, Chemical & Atomic Workers Union v. Occupational Safety & Health Administration, 145 F.3d 120 (3d Cir. 1998) ("OCAWU"), the Third Circuit set forth its own set of factors to evaluate unreasonable agency delay:

> First, the Court should ascertain the length of time that has elapsed since the agency came under a duty to act.  Second, the reasonableness of the delay should be judged in the context of the statute authorizing the agency's action.  Third, the court should assess the consequences of the agency's delay.  Fourth, the court should consider "any plea of administrative error, administrative inconvenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources."

---

[14]TRAC enumerates the following six guiding considerations federal courts have used in determining whether agency delay is unreasonable:
(1) the time agencies take to make decisions must be governed by a rule of reason;
(2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for the rule of reason;
(3) delay that might be unreasonable in the sphere of economic regulations are less tolerable when human health and welfare are at stake;
(4) the effect of expediting delayed action on agency activities of a higher or competing priority;
(5) the nature and extent of the interests prejudiced by the delay;
(6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.  See TRAC, 750 F.2d at 80.

145 F.3d at 123 (internal citations omitted).  Using these factors, a Court's inquiry into the reasonableness of an agency's delay under the APA is fact-intensive.  Id.

The Third Circuit's OCAWU factors in evaluating these kinds of naturalization claims were relied on in Daraji v. Monica, 2008 WL 183643, *5 (E.D.Pa. Jan. 18, 2008) (finding insufficient evidence of reasonableness of USCIS's delay under the OCAWU factors where plaintiff had been interviewed by USCIS, and remanding these matters to USCIS for adjudication of Plaintiffs' applications within ninety days).  Instead of using the OCAWU factors verbatim, however, some district courts have acknowledged the test in their analysis, but concluded that the manner in which a court evaluates unreasonable agency delay falls within the court's discretion. See Assadzadeh v. Mueller, 2007 WL 3252771 (E.D.Pa. Oct. 31, 2007) (noting the OCAWU factors, but concluding that each case is fact-intensive and within the court's discretion); Han Cao v. Upchurch, 496 F. Supp.2d 569, 577 (E.D.Pa. 2007) ("There is no particularized standard by which we are directed to determine whether a[n agency] delay is unreasonable.")

For all the above reasons, this Court finds USCIS's requirement of the name check for Plaintiffs, and the delay in completing it, is "without observance of procedure required by law." 5 U.S.C. § 706.

## V.    Relief to Plaintiffs

Ruling in favor of Plaintiffs, but only setting deadlines for USCIS action on their naturalization applications, would be similar to dealing only with the risks posed by the tip of an iceberg, but ignoring the submerged dangers – here, the unreasonable delays that have occurred. These delays are caused by USCIS relying on the inadequately authorized FBI name check

program, without any transparency or explanation to Plaintiffs of why their applications have

been pending for some 30 to 47 months.

Another apt metaphor is the screaming two-year-old child who can be quickly appeased

by giving in to demands, but doing so frequently only causes more serious, long-term problems

as the child grows older.  The Court has determined that it is necessary and appropriate to require

USCIS to address the delay by revising its regulations, which is accomplished by initiating the

notice and comment rule-making procedure.

When a government agency acts improperly, the Court has broad discretion in designing

an appropriate remedy suiting the needs of the plaintiffs before it.  Armstead v. U.S. Dept. of

Housing and Urban Development, 815 F.2d 278, 283 (3d Cir. 1987). It is clear that a district

court has power to craft remedial action specific to a given factual situation.  United

Steelworkers of America, AFL-CIO v. Pendergrass, 819 F.2d 1263, 1270 (1987) (directing

Secretary to publish a hazard communication standard applicable to all workers covered by the

Occupational Safety and Health Act within 60 days of the Order based on broad powers granted

to the Court to compel agency action under the APA, 5 U.S.C. § 706(1) and 28 U.S.C. §

1651(a)).

In both Armstead and Pendergrass, the Circuit faced improper agency action contrary to

authorization, and approved remedial district court relief specific to and appropriate for the

problems faced.  This Court attempts to do the same, but no more.  It is not the Court's function

or intent to preclude USCIS from using FBI name checks, or to otherwise meddle into USCIS

decision-making.

In determining what relief to give these Plaintiffs under the above principles, it is important that the Court tread carefully because of the legitimate national security concerns under which the Defendants must operate, and because Courts are not equipped to micro-manage the naturalization process and thus should not unduly interfere with the operation of an important agency of the federal government.

The Court feels strongly that these Plaintiffs deserve relief that will promptly lead to adjudication of their naturalization petitions.   As many other district court judges have concluded, it is simply unacceptable to require an LPR to wait several years for action on a naturalization petition.  Plaintiffs have demonstrated that there must be some improvement in the underlying USCIS regulatory framework, so that the name check program will be appropriately authorized, accurately described, fairly administered, and concluded without reasonable delay.

The other problem with giving USCIS a deadline for action regarding these Plaintiffs is that such an order would have predictable but unfair results: USCIS would obtain expedited treatment from the FBI for these Plaintiffs, and other applicants would be placed behind Plaintiffs in line.  This "squeaky wheel" solution only allows one applicant to "pass Go" at the expense of another applicant who will be moved several spaces backward (without notice).  One reason for the Court requiring that USCIS institute a notice and comment procedure in order to continue the FBI name check program as to these Plaintiffs is to increase the transparency of the process.  This does not require revealing confidential information or national security precautions.  However, in doing so, USCIS should examine several issues, and some of these are mentioned in the Ombudsman Report:

1.      Why is an FBI name check required for an LPR who has already undergone at

least one and often two prior name checks?[15]

2.      Why is a check of the criminal background insufficient for an LPR who has already passed an FBI name check?

3.      Should USCIS use risk management principles and consider the cost/benefit analysis of spending many millions of dollars for repetitive FBI name checks for all naturalization applicants, considering that the act of naturalizing an LPR itself neither increases nor decreases our national security?

4.      Would Congressional hearings and increased appropriations for USCIS security procedures be appropriate?

5.      How can more information about delay be provided to applicants whose name checks require more than the usual time to process?

6.      Is the USCIS litigation strategy, as described in prior Memoranda, appropriate, considering the costs and burdens it places on naturalization applicants and their families, the U.S. Attorney's Offices and the many district court judges who have been faced with essentially identical issues?[16]

7.      Are the delays themselves dangerous to our security?

---

[15]The government's brief asserts the Court's January 22, 2008 Memorandum was in error in stating that a name check is required for every visa applicant.

[16]The Court repeats its prior observation that these cases would appear appropriate for consideration by the Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407, and the Clerk is directed to send a copy of this Memorandum to the Panel.  Also, it is still not clear why the government has not moved for class action treatment so that the legal issues which appear in virtually every one of these cases, i.e., subject matter jurisdiction, availability of remedial action, and validity of the FBI name check, can be resolved on a class-wide basis.

Of great concern is that there is no way of knowing, from the information on the record, whether the name check process, as applied to these Plaintiffs, has been held up because of some truly sensitive national security concern, or because of some bureaucratic delay in securing the appropriate files, or because overloaded FBI personnel have not had the opportunity to address the pertinent name check request.

The Court believes that a fair, albeit interim, resolution of these cases would be advanced if the following were to occur:

1.      Within thirty (30) days USCIS shall provide to Plaintiffs or their counsel accurate reason(s) as to why their FBI name check has not been completed, but if appropriate, this information may be submitted to the Court in camera.

2.      The Court will enjoin USCIS from using the FBI name check program as a factor in the decision making as to these Plaintiffs unless within thirty (30) days, USCIS has initiated a notice and comment procedure, pursuant to the APA, concerning its use of the FBI name check procedure.

3.      The Court will require the parties to file a report no later than March 14, 2008, setting forth their position on these requirements.  USCIS shall indicate, assuming it is prepared to initiate notice and comment procedures, how quickly they can be completed including adoption of new regulations.  Plaintiffs may request other additional relief they should receive pending further administrative outcomes.[17]

---

[17]      There is precedent for a court to set time frames for agency compliance, see National Treasury Employees Union v. Newman, 768 F. Supp. 8 (D. D.C. 1991), and also requiring counsel to submit periodic reports on its compliance with court orders.  From the beginning of these proceedings, the Court has urged counsel for USCIS to consider an

4.      In view of the fact that the Court can retain jurisdiction over the remedial action being required, even if some or all of the present Plaintiffs' petitions are adjudicated, the Court will lift the injunction against USCIS proceeding with the adjudication of the Plaintiffs' naturalization petitions.

An appropriate Order follows.

---

administrative global solution to these problems, rather than the case-by-case litigation, with the repetitive Motions to Dismiss for lack of subject matter jurisdiction, and the government's practice of resolving these cases before they reach trial by finally expediting a decision for those naturalization applicants who have gone to the trouble and expense of filing lawsuits.

## ORDER

AND NOW, this 8th day of February, 2008, based on the foregoing Memorandum, it is hereby ORDERED as follows:

1.    The Motions for Summary Judgment of Plaintiffs and Defendants are GRANTED in part and DENIED in part.

    a.    <u>Mocanu</u>, 07-cv-0445, Government's Motion for Summary Judgment (Doc. No. 20) and Plaintiff's Motion for Summary Judgment (Doc. No. 18);

    b.    <u>Cusumano</u>, 07-cv-0971, Government's Motion for Summary Judgment (Doc. No. 17) and Plaintiff's Motion for Summary Judgment (Doc. No. 14);

    c.    <u>Barikbin</u>, 07-cv-3223, Government's Motion for Summary Judgment (Doc. No. 7) and Plaintiff's Motion for Summary Judgment (Doc. No. 9);

    d.    <u>Zhang</u>, 07-cv-2718, Government's Motion for Summary Judgment (Doc. No. 12) and Plaintiff's Motion for Summary Judgment (Doc. No. 15);

    e.    <u>Newton</u>, 07-cv-2859, Government's Motion for Summary Judgment (Doc. No. 7) and Plaintiff's Motion for Summary Judgment (Doc. No. 8);

    f.    <u>Hussain</u>, 08-cv-195, Government's Motion for Summary Judgment (Doc. No. 8) and Plaintiff's Motion for Summary Judgment (Doc. No. 13).

2.    The government's Motions to Dismiss in <u>Zhang</u> (Doc. No. 6, 8) and <u>Newton</u> (Doc. No. 4) are DENIED.

-36-

3.      As to Plaintiffs Cusumano and Hussain, who have already been interviewed, USCIS shall show cause, within fourteen (14) days, why their applications should not be adjudicated forthwith.

4.      The FBI, and its Director and employees named as Defendants in these cases, are DISMISSED as Defendants.

5.      The Injunction entered in the Order of January 11, 2008, and continued in the Order of January 22, 2008, is VACATED.

6.      Within thirty (30) days USCIS shall provide to Plaintiffs or their counsel accurate reason(s) as to why their FBI name check has not been completed, but if appropriate, this information may be submitted to the Court in camera.

7.      USCIS is enjoined, pending further Order of Court, from using the FBI name check program as a factor in the decision making as to these Plaintiffs, unless within thirty (30) days, USCIS has initiated a notice and comment procedure, pursuant to the APA, concerning its use of the FBI name check procedure.

8.      The parties shall file reports no later March 14, 2008 as to their positions on these requirements.

9.      The Court will retain jurisdiction over these cases.

10.      The Court will hold a hearing on March 18, 2008 at 10:00 a.m. in Courtroom 3A, at which time the Court will consider arguments and any evidence a party wishes to offer on

these remedies, and any other remedies that may be appropriate.[18]


BY THE COURT:

s/Michael M. Baylson

_____

Michael M. Baylson, U.S.D.J.

O:\CIVIL 07-08\07-0445 Mocanu v. Mueller\Mocanu 07-445 - Memo re cross MSJ.wpd

_____

[18] Two other cases pending before the undersigned are not included in this Order.  In Bodomov v. U.S. Department of Justice, et al., C.A. 07-1482, Plaintiff's counsel believes that his client will be naturalized promptly and has requested to be excluded from this Order.  In Eliassant v. Monica, et al., C.A. 07-4747, Plaintiff's counsel believes that his client, seeking LPR status, will also receive relief promptly.